UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HORSEPLAY INFLATABLES, LLC, *a Florida limited liability company*,

Plaintiff,

v. Case No: 8:25-cv-03477-JLB-NHA

NINO JOSEPH RUISI, III,

Defendant.
_______________________________________/

**ORDER**

This matter is before the Court on *pro se* Defendant Nino Joseph Ruisi, III's Motion to Dismiss. (Doc. 52). Plaintiff alleges federal question jurisdiction for violations of the Lanham Act (15 U.S.C. § 1125) and the Computer Fraud and Abuse Act (CFAA) (18 U.S.C. § 1030). Plaintiff also alleges Florida state law claims as follows: common law trademark infringement, common law unfair competition, defamation *per se*, trade libel, tortious interference with existing business relationship, violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), and violation of the Florida Computer Abuse and Data Recovery Act (CADRA). (Doc. 2 at 10–29). In response, Defendant filed a Motion to Dismiss (Doc. 52). Upon careful review of the Complaint and the parties' briefing, the Court finds that Defendant's Motion to Dismiss is due to be **GRANTED**.

**BACKGROUND**[1]

Plaintiff is a company engaged in the design, production, and sale of adult inflatable toy products. (Doc. 2 at 1–2). Beginning in mid-2023, Defendant, a former customer of Plaintiff's, organized several online stores and marketed similar products under the name "Horseplay Toys." (*Id.* at ¶ 9). Plaintiff claims that the websites create confusion among customers because they use Plaintiff's trade name, mimic Plaintiff's trade dress, and offer nearly identical inflatable products. (*Id.*). Plaintiff further claims that, during the same timeframe, Defendant opened social media accounts under "Horseplay Toys" to impersonate Plaintiff and publish defamatory statements. (*Id.* at ¶¶ 9–10).

Defendant also placed hundreds of fraudulent orders on Plaintiff's online store using false names and emails. (*Id.* at ¶ 13). Plaintiff alleges that there were often 10 orders per day, every day. (*Id.*). And Plaintiff claims that the orders flooded Plaintiff's system, materially disrupting business operations. (*Id.*).

On December 19, 2025, Plaintiff filed this action against Defendant, bringing nine claims: (1) common law trademark infringement, (2) false designation of origin under the Lanham Act, (3) common law unfair competition, (4) defamation *per se*, (5) trade libel, (6) tortious interference with existing business relationship, (7) violation of FDUTPA, (8) violation of the Computer Fraud and Abuse Act, and (9)

[1] "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999). Accordingly, this background section relies on the facts recited in the Complaint. (*See* Doc. 2).

violation of the Florida Computer Abuse and Data Recovery Act. (*Id.* at 10–29). In response, Defendant filed a Motion to Dismiss (Doc. 52) on May 6, 2026.

**LEGAL STANDARD**

"A plaintiff seeking to establish personal jurisdiction over a nonresident defendant 'bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction.'" *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (quoting *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009)). To avoid dismissal, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Though a complaint attacked under Federal Rule of Civil Procedure 12(b)(6) "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999) (citing *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998)). Thus, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

## DISCUSSION

The Complaint alleges that the Court "has personal jurisdiction over Defendant under Florida's Long-Arm Statute because Defendant committed tortious acts directed at and causing injury to Plaintiff within the State of Florida." (Doc. 2 at ¶ 3) (citing Fla. Stat. § 48.193(1)(a)(2)). In his Motion to Dismiss, Defendant moves to dismiss the Complaint, arguing in part that "no min[imum] contacts were met nor does the long arm of Florida apply." (Doc. 52 at ¶ 5). Upon careful review of Defendant's Motion to Dismiss, Plaintiff's Complaint, and the entire record, the Court **GRANTS** Defendant's Motion to Dismiss.

### I. Whether Plaintiff States a Claim Upon Which Relief Can Be Granted.

Defendant moves to dismiss the Complaint, in part, for lack of personal jurisdiction. (Doc. 52). In resolving personal jurisdiction, courts consider: "(1) whether personal jurisdiction exists over the nonresident [defendant] under Florida's long-arm statute, and (2) if so, whether that exercise of jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Louis Vuitton Malletier*, 736 F.3d at 1350.

As an initial matter, it is axiomatic that "Florida's long-arm statute is to be strictly construed." *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996). "The reach of Florida's long-arm statute 'is a question of Florida law,' and this Court is required to apply the statute 'as would the Florida Supreme Court.'" *Louis Vuitton Malletier*, 736 F.3d at 1352 (quoting *United Techs.*, 556 F.3d at 1274). "[A]bsent some indication that the Florida Supreme Court would hold

otherwise," the Court is "bound to adhere to the interpretations of Florida's long-arm statute offered by Florida's District Courts of Appeal." *Id.*

That said, under Florida's long-arm statute, personal jurisdiction may be either general or specific. *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 808 (11th Cir. 2010). Florida's long-arm statute enumerates nine acts subjecting a nonresident to personal jurisdiction. *See* Fla. Stat. § 48.193. Plaintiff argues that specific personal jurisdiction is applicable here. (*See* Doc. 2 at ¶¶ 31–33). Florida's long-arm statute states the following in relevant part:

> A person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from any of the following acts:
>
> * * *
>
> (2) Committing a tortious act within this state.

Fla. Stat. § 48.193(1)(a)(2).

"[I]n order to 'commit a tortious act' in Florida, a defendant's physical presence is not required." *Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002). A defendant can commit a tortious act "through the nonresident defendant's telephonic, electronic, or written communications into Florida. However, the cause of action must arise from the communications." *Id.* Still, "[t]he threshold question

that must be determined is whether the allegations of the complaint state a cause of action." *Id.* "If the complaint does state a cause of action, then it must be determined whether the alleged cause of action arises from these communications." *Id.* In light of the foregoing, the Court first evaluates Plaintiff's Complaint under Rule 12(b)(6).

Plaintiff's Complaint pleads nine total claims, with seven of the nine claims being Florida state law claims, as follows: (Count 1) common law trademark infringement, (Count 2) false designation of origin under the Lanham Act, (Count 3) common law unfair competition, (Count 4) defamation per se, (Count 5) trade libel, (Count 6) tortious interference with existing business relationship, (Count 7) violation of FDUTPA, (Count 8) violation of the CFAA, and (Count 9) violation of Florida's CADRA. (Doc. 2 at 10–29). The Complaint alleges federal question jurisdiction under 28 U.S.C. § 1331 for violations of the Lanham Act and the CFAA, and supplemental jurisdiction under 28 U.S.C. § 1367 for the seven state law claims. The Court starts its analysis with the federal claims.

**A. False Designation of Origin Under 15 U.S.C. § 1125(a)(1)(A)**

Plaintiff fails to state a claim of false designation under the Lanham Act (Count 2). The Complaint alleges that Plaintiff has enforceable trademark rights acquired through common law to the name "Horseplay Toys," (*id.* at 10–11), and that Defendant used this trademark in violation of 15 U.S.C. § 1125(a)(1)(A), a section of the Lanham Act prohibiting false designation of origin. (*Id.* at 13). This,

Plaintiff argues, causes customer confusion and results in unfair competition and trademark infringement. (*Id.* at 14–15).

To prevail on a false designation of origin claim, a plaintiff must show it was either actually or likely to be damaged by the fact that the defendant used a "false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which was likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." *Lipscher v. LRP Publications, Inc.*, 266 F.3d 1305, 1312–13 (11th Cir. 2001) (quoting 15 U.S.C. § 1125(a)(1)(A)).

"Under the Lanham Act, federal trademark protection is available only to 'distinctive' marks—'marks that serve the purpose of identifying the *source* of . . . goods or services.'" *Royal Palm Props., LLC v. Pink Palm Props., LLC*, 950 F.3d 776, 782 (11th Cir. 2020) (quoting *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1357 (11th Cir. 2007) (emphasis in original)). There are two ways a mark can be distinctive: it can be "inherently" distinctive, or it can "acquire" its distinctiveness. *Id.* An "inherently" distinctive mark identifies the source of a product or service. For example, "Coca-Cola" is an inherently distinctive mark of a single brand and producer. *Id.* On the other hand, a mark that has "acquired" distinctiveness "might initially have been understood to describe a broad class of potential products or services, but over time it has taken on a 'secondary meaning' that links it to a particular source: 'California Pizza Kitchen,' for example, may facially describe any

random pizza eatery in the Golden State, but the public has come to associate it with one brand in particular." *Id.* at 783.

To demonstrate proof of a valid trademark, a plaintiff need not have a registered mark. The Eleventh Circuit has recognized that "the use of another's unregistered, *i.e.*, common law, trademark can constitute a violation of [the Lanham Act] where the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a false representation that its goods came from the same source." *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512–13 (11th Cir. 1984) (internal quotations and citations omitted). However, only those marks that are capable of distinguishing the owner's goods from those of others, *i.e.*, that are sufficiently "distinctive," are eligible for federal registration or protection as common law marks under the Lanham Act. *Tana v. Dantanna's*, 611 F.3d 767, 773 (11th Cir. 2010).

The Eleventh Circuit recognizes four categories of distinctiveness, which are listed in ascending order of strength: "(1) generic—marks that suggest the basic nature of the product or service; (2) descriptive—marks that identify the characteristic or quality of a product or service; (3) suggestive—marks that suggest characteristics of the product or service and require an effort of the imagination by the consumer in order to be understood as descriptive; and (4) arbitrary or fanciful—marks that bear no relationship to the product or service, and the

strongest category of trademarks." *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 797–98 (11th Cir. 2003).

A term which suggests the basic nature of the service is generic and is typically incapable of achieving service mark protection because it has no distinctiveness. *Coach House Rest., Inc. v. Coach & Six Restaurants, Inc.*, 934 F.2d 1551, 1560 (11th Cir. 1991). Generic marks are generally incapable of receiving trademark protection and may never be registered as trademarks under the Lanham Act. *Forman*, 509 F.3d at 1358. Descriptive marks, though not inherently distinctive, may become sufficiently distinctive to enjoy trademark protection by acquiring "secondary meaning." 15 U.S.C. § 1052(f); *Coach House Rest., Inc.*, 934 F.2d at 1560.

In evaluating whether there is a likelihood of confusion between two marks, the Eleventh Circuit applies a multifactor test, considering each of the following seven factors: (1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public. *Forman*, 509 F.3d at 1360; *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1207 (11th Cir. 2004).

If a mark is generic, descriptive, and not inherently distinctive, the marks must have attained secondary meaning for a plaintiff to have a protectable interest in them. *Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 117–18 (5th Cir. 1979) ("The case law uniformly requires that we refuse trade name protection to a descriptive term unless it has acquired a secondary meaning."). A descriptive term acquires secondary meaning when "the primary significance of the term in the minds of the consuming public is not the product but the producer." *Id.* at 118.

Here, Plaintiff has failed to demonstrate that it has common law trademark rights. The mark "Horseplay Toys" is generic because customers can readily perceive the nature of the product. In a similar case, *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 654 F.3d 1179 (11th Cir. 2011), the Eleventh Circuit evaluated whether "Universal Night Sight/UNS" was protected as a common law trademark. The company manufactured night vision devices for firearms. The district court found that customers could readily perceive the nature of the product because "night sight," or the ability to see at night, did not require customers to use their imagination. *Id.* at 1189–90. The district court found that "night sight" was a generic term used in the sniper community to refer to products that enable users to see at night. The district court further found that the word "universal" was descriptive and, therefore, the mark as a whole was not protected. *Id.* The Eleventh Circuit affirmed, holding that the mark was descriptive and could not be protected. *Id.*

Likewise, Plaintiff's alleged mark, "Horseplay Toys," is generic insofar as the basic nature of the service is generic. *Coach House Rest., Inc.*, 934 F.2d at 1560. Specifically, customers can infer that the nature of the product is horse toys. *Engineered Tax Services, Inc. v. Scarpello Consulting, Inc.*, 958 F.3d 1323, 1329 (11th Cir. 2020) (explaining that a mark is "merely descriptive, rather than suggestive—and thus is not inherently distinctive—if 'the customer who observes the term can readily perceive the nature of plaintiff's services, without having to exercise his imagination'"). Generic marks like this are *incapable* of receiving trademark protection and may never be registered as trademarks under the Lanham Act. *Forman*, 509 F.3d at 1358. Because Plaintiff's marks are descriptive and not inherently distinctive, the marks must have attained secondary meaning for Plaintiff to have a protectable interest in them.

In evaluating whether a mark has attained a secondary meaning, the Court considers four factors: "(1) the length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the user of the mark to promote a conscious connection in the public's mind between the name and the user's product or business; and (4) the extent to which the public actually identifies the name with the user's product or venture." *Custom Mfg. & Eng'g, Inc. v. Midway Services, Inc.*, 508 F.3d 641, 648 n.8 (11th Cir. 2007). The party seeking trademark protection carries the burden of proof and must produce a "high degree of proof . . . to establish secondary meaning." *Id.* (emphasis added).

First, Plaintiff alleges that it has used "Horseplay Toys" in commerce since at least 2018 and used it on social media platforms since 2015—well before Defendant's use of the name. (Doc. 2 at ¶ 47). There is no bright-line rule requiring a specific timeframe for a term to acquire secondary meaning. Taking these allegations as true, Plaintiff has satisfied this element. *Welsh v. Martinez*, No. 2:22-cv-216, 2022 WL 2356971, at *1 n.1 (M.D. Fla. June 30, 2022) (citing *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976)) ("[T]he facts will be presented in a light most favorable to [Plaintiff]").

Second, Plaintiff alleges that it markets and sells its products through its e-commerce storefront and social media, reaching customers throughout the United States. (Doc. 2 at ¶ 43). These allegations are insufficient to satisfy the second factor. For advertising to serve as evidence of secondary meaning, there must be a link between the trade dress and the sales and advertising. *Vital Pharms., Inc. v. Monster Energy Co.*, 472 F. Supp. 3d 1237, 1256 (S.D. Fla. 2020) (collecting cases); *see, e.g.*, *Tropic Ocean Airways, Inc. v. Floyd*, No. 13-CV-10113-JLK, 2014 WL 12479408, at *3 (S.D. Fla. May 9, 2014) (finding insufficient support for the second factor because the plaintiff pleaded general allegations of advertising and promotion without specifying how it promoted the trademark). Here, Plaintiff does not indicate how it promoted the mark in its advertising.

As for the third and fourth factors, the Complaint does not explain Plaintiff's efforts to promote a conscious connection between "Horseplay Toys" and its product in the public's mind or the extent to which the public does identify the name with

its product. (Doc. 2). Indeed, Plaintiff ignores the third factor altogether and, in support of the fourth, merely states that there is "substantial consumer recognition" without more. (*Id.* at ¶ 37); *Tropic Ocean Airways*, 2014 WL 12479408, at *3 (explaining that a conclusory statement that plaintiff has "developed substantial goodwill" in promoting its product to customers is insufficient).

Plaintiff has failed to plead that the "Horseplay Toys" mark is distinct rather than generic. *Custom Mfg. & Eng'g*, 508 F.3d at 648 n.8 (explaining that the party seeking trademark protection carries the burden of proof and must produce a "high degree of proof . . . to establish secondary meaning for a descriptive term"). Because "Plaintiff's failure to establish a likelihood of confusion as to its Lanham Act claim also extinguishes its claim under Florida law," Plaintiff has failed to state a claim as to its FDUTPA claim or its Florida common law unfair competition and trademark infringement claims. *Id.* at 652. Therefore, Plaintiff's claims in Counts 1, 2, 3, and 7 are **DISMISSED**. After careful consideration, the Court finds that because of the textbook descriptive nature of the mark, "Horseplay Toys," and its lack of any distinctiveness, the Court will not allow amendment as to the claims in Counts 1, 2, 3, and 7 because any such amendment would be futile. *Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007) ("Leave to amend a complaint is futile when the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant.").

**B. Computer Fraud and Abuse Act (18 U.S.C. § 1030)**

Plaintiff similarly fails to state a claim for a violation of the CFAA (18 U.S.C. § 1030). (*See* Doc. 2 at 25–27). The Act provides as follows:

(a) Whoever ...

> (4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1–year period; [or]
>
> (5)(A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer; . . .
>
> shall be punished as provided. . . .
>
> (g) Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief.

18 U.S.C. § 1030.

Simply stated, to prove a claim under § 1030(a)(4), a party must satisfy the following four elements: that a defendant "(1) accessed a protected computer (2) without authorization or by exceeding such authorization as was granted, (3) knowingly and with intent to defraud, and (4) as a result has furthered the intended fraud and obtained anything of value." *Pharmerica, Inc. v. Arledge,* 2007 WL 865510, at *6 (M.D. Fla. Mar. 21, 2007) (citation modified).

A computer is defined as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage

functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device." 18 U.S.C. § 1030(e)(1); *see also Florida Atl. Univ. Bd. of Trustees v. Parsont*, 465 F. Supp. 3d 1279, 1290 (S.D. Fla. 2020). And a computer is "protected" if it "is used in or affect[s] interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B); *see also Parsont*, 465 F. Supp. 3d at 1290. Plaintiff alleges violations of both subsections (a)(4) and (a)(5)(A). The Court finds that Plaintiff fails to state a claim under either subsection.

Subsection (a)(4) of the CFAA punishes two types of access to a protected computer: that without authorization or that which exceeds authorized access. The "without authorization" clause protects computers from "those who access a computer without any permission at all." *See Van Buren v. United States*, 593 U.S. 374, 389 (2021) (citation modified). And "an individual 'exceeds authorized access' when he accesses a computer with authorization but then obtains information located in particular areas of the computer—such as files, folders, or databases—that are off limits to him." 18 U.S.C. § 1030(e)(6); *Van Buren*, 593 U.S. at 396.

"The statutory definition [of exceeds authorized access] appears purposefully aimed at the company *insider* that already has authorization—not the non-agent *outsider* with public access to a company website." *Lockheed Martin Corp. v. Speed*, No. 6:05-CV-1580-ORL-31, 2006 WL 2683058, at *6 (M.D. Fla. Aug. 1, 2006). "[T]he

term 'exceeding authorized access' presumes, it would seem, a threshold level of access that is not wide-open to the public." *Id.* at *6 n.7.

Here, Plaintiff alleges that Defendant accessed its *publicly available* online store platform when he created multiple fake customer accounts and placed hundreds of fraudulent orders. (*See* Doc. 2 at ¶ 13). But the CFAA does not punish general access to a public website. *See Speed*, 2006 WL 2683058, at *6. Defendant was generally authorized as a member of the public to access Plaintiff's public website when he placed those orders and created those accounts. (*See* Doc. 2 at ¶ 13). And he did not exceed some previously granted permission to access a protected computer either. (*See id.*). Indeed, "[i]t is odd to consider any internet passerby to the company website as having company authorization." *See Speed,* 2006 WL 2683058 at *6 n.7. Therefore, Plaintiff's allegation that Defendant violated subsection (a)(4) of the CFAA fails.

As for subsection (a)(5), Plaintiff fails to adequately plead a violation here as well. This subsection punishes one who "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer." 18 U.S.C. § 1030(a)(5)(A); *Trademotion, LLC v. Marketcliq, Inc.*, 857 F. Supp. 2d 1285, 1291 (M.D. Fla. 2012). "In order to state a claim under subsection 1030(a)(5)(A)[,] a party must allege both damage and a loss aggregating at least $5,000 in value." *Cheney v. IPD Analytics, L.L.C.*, No. 08-23188-CIV, 2009 WL 1298405, at *6 (S.D. Fla. Apr. 16, 2009), *report and recommendation adopted sub nom. Cheney v. IPD*

*Analytics, LLC*, No. 08-23188-CIV-MORENO, 2009 WL 2096236 (S.D. Fla. May 8, 2009) (citation modified).

Damage is defined as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). "The use of [the] term 'integrity' in the statute to define damage requires some diminution in the completeness or usability of data or information on a computer system." *Cheney*, 2009 WL 1298405 at *6 (citation modified). "Likewise, the use of [the] word 'availability' suggests that a party asserting a claim under subsection 1030(a) may prove damage by showing that defendant's actions somehow made certain data or program not readily obtainable." *Cheney*, 2009 WL 1298405 at *6.

Here, Plaintiff merely makes a conclusory statement that the fraudulent orders Defendant placed on the website flooded the system and materially disrupted operations. (Doc. 2 at ¶ 13). There is no allegation that the website "or information on it was not useable or obtainable as required under this definition." *See Trademotion*, 857 F. Supp. 2d at 1292. In fact, the exhibit attached by Plaintiff to support the claim that Defendant made these fraudulent orders indicates that the website was still operable, as Defendant wrote on social media contemporaneously to inform other users that a majority of the orders on the website were from him.[2] (Doc. 2-7). It is therefore unsurprising that Plaintiff neglected to allege an impairment to the integrity or availability of the website.

[2] "[I]f the allegations of the complaint about a particular exhibit conflict with the contents of the exhibit itself, the exhibit controls." *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016) (citation omitted). Thus, the Court follows the exhibit.

*See Trademotion*, 857 F. Supp. 2d at 1292. The exhibit would not exist if it did.

In sum, Plaintiff fails to adequately plead a claim under the CFAA. And because the Florida Computer Abuse and Data Recovery Act is modeled after the CFAA, that state claim necessarily fails as well. *See Parsont*, 465 F. Supp. 3d at 1290 ("Since both statutes have similar elements . . . the Court will focus its inquiry on the CFAA.") (citations omitted). After careful consideration, the claims in Counts 8 and 9 are therefore **DISMISSED**. And after careful consideration, the Court will not allow amendment as to the claims in Counts 8 and 9 because any such amendment would be futile. *Cockrell*, 510 F.3d at 1310 ("Leave to amend a complaint is futile when the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant.").[3]

**II. The Court Declines to Exercise Supplemental Jurisdiction Over the Remaining State Law Claims.**

With the federal claims being dismissed, the Court declines to exercise supplemental jurisdiction over the remaining state law claims in Counts 4, 5, and 6.

As an initial matter, this Court lacks independent subject-matter jurisdiction over the remaining state law claims. Federal courts are courts of limited jurisdiction. A state law claim cannot, by itself, support federal-question jurisdiction. 28 U.S.C. § 1331 ("[D]istrict courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United

---

[3] Because the Complaint fails to pass the threshold of stating a claim for these federal causes of action, the Court does not need to reach the inquiry of whether Plaintiff can show that this Court has specific personal jurisdiction over Defendant. *See Wendt*, 822 So. 2d at 1260.

States."). Plaintiff brought its state-law claims under supplemental jurisdiction. 28 U.S.C. § 1367.

Though a federal court may exercise supplemental jurisdiction over state law claims where those claims arise from the same conduct and circumstances as the federal claims, there are no federal claims remaining here because the Court has dismissed the claims of Counts 2 and 8 that were brought under 28 U.S.C. § 1331 federal question jurisdiction. *See* 28 U.S.C. § 1367; (Doc. 2).

And the Court may decline to exercise supplemental jurisdiction over such state law claims after the Court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). Whether to exercise supplemental jurisdiction over these state law claims is a decision "vested in the sound discretion of the district court." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1288 (11th Cir. 2002).

"Where § 1367(c) applies, considerations of judicial economy, convenience, fairness, and comity may influence the court's discretion to exercise supplemental jurisdiction." *Baggett v. First Nat. Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997). In the interest of judicial economy, convenience, fairness, and comity, "[s]tate courts, not federal courts, should be the final arbiters of state law." *Id.* (citing *Hardy v. Birmingham Bd. of Educ.*, 954 F.2d 1546, 1553 (11th Cir. 1992)).

Here, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. This Court finds, in its discretion, that it should avoid deciding any independent state law claims that may or may not exist. This is best

left to the Florida state courts. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."). Consequently, the Court dismisses the remaining state law claims without prejudice. Therefore, the remaining counts, Counts 4, 5, and 6, are **DISMISSED without prejudice**.

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that Defendant's Motion to Dismiss (Doc. 52) is **GRANTED**.

1. Plaintiff's Complaint (Doc. 2) is **DISMISSED**.
2. Counts 1, 2, 3, 7, 8, and 9 are **DISMISSED with prejudice.**
3. Counts 4, 5, and 6 are **DISMISSED without prejudice,** subject to any right Plaintiff may have to file such claims in Florida state court. The Court expresses no opinion as to the merits of these state-law claims.
4. The Clerk of Court is **DIRECTED** to terminate all pending motions and deadlines, enter judgment in favor of Defendant as to Counts 1, 2, 3, 7, 8, and 9, and to close the case.

**IT IS SO ORDERED** in Tampa, Florida on November 23, 2026.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE